IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:12-CT-3122-FL

| | | |
|---|---|---|
| SAMUEL ELLIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| ROBERT LEWIS, DR. PAULA SMITH, | ) | |
| YVONNE LOCKLEAR, DR. RON | ) | |
| BELL, and TERI CATLETT, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter comes before the court on defendant Bell's motion for summary judgment (DE 115) and the first and second motions for summary judgment (DE 117, 129) filed by defendants Teri Catlett, Robert Lewis, Yvonne Locklear, and Paula Smith. Also before the court is defendant Dr. Ron Bell's motion to seal (DE 128). Plaintiff did not respond to the motion to seal, but the remaining motions were fully briefed. In this posture, the issues raised are ripe for adjudication. For the following reasons, the court grants defendant Bell's motion to seal, denies the second motion for summary judgment filed by defendants Teri Catlett, Robert Lewis, Yvonne Locklear, and Paula Smith, and grants defendants' respective remaining motions for summary judgment.

## STATEMENT OF THE CASE

For ease of reference, the statement of the case as set forth in this court's September 3, 2014, order is as follows:

> On June 4, 2012, plaintiff, a state inmate, filed this civil rights action
> *pro se* pursuant to 42 U.S.C. § 1983 against defendants [Dr. Ron]
> Bell, [Director of Prisons for the Department of Public Safety

("DPS")] Robert C. Lewis ("Lewis"), [Chief of Health Services for the Division of Adult Correction and Juvenile Justice in the DPS] Dr. Paula Smith ("[]Smith"), [Nurse] Yvonne Locklear ("Locklear"), as well as previously named defendants Glenn Williams ("Williams"), Hope Smith ("H. Smith"), Steve Bissell ("Bissell"), Bonnie Strickland ("Strickland"), and Sharon Kristoff ("Kristoff").[1] Plaintiff alleged that defendants acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment to the United States Constitution. Plaintiff sought declaratory and injunctive relief as well as compensatory and punitive damages. On October 30, 2012, the court conducted a frivolity review of plaintiff's action pursuant to 28 U.S.C. § 1915(e)(2)(B), and allowed plaintiff to proceed.

The court subsequently entered an order directing North Carolina Prisoner Legal Services ("NCPLS") to investigate plaintiff's claims to determine whether appointment of counsel was warranted. On April 1, 2013, NCPLS responded to the court's order of investigation, and informed the court that it would provide plaintiff representation in this action. Plaintiff subsequently voluntarily dismissed defendants Kristoff, Williams, Bissell, H. Smith, and Strickland from this action without prejudice.

On October 14, 2013, plaintiff filed a motion for leave to file an amended complaint, along with a proposed amended complaint. On November 21, 2013, the court entered an order granting plaintiff's motion to amend, and finding that plaintiff could proceed with his action against defendants Lewis, []Smith, Locklear, Bell, and newly named defendant Teri Catlett ("Catlett")[, who is employed as the Deputy Director of Health Services for the Division of Adult Correction and Juvenile Justice in the DPS]. Plaintiff filed his amended complaint on November 26, 2013.

On January 6, 2014, Bell filed his motion to dismiss pursuant to Rule 12(b)(6), arguing that plaintiff failed to state a claim and that plaintiff's action should, in part, be dismissed as time barred. The motion was fully briefed.

See (DE 104).

---

[1] As set forth herein, these previously-named defendants subsequently were voluntarily dismissed, and the court constructively amends the caption of this order to reflect dismissal of these defendants.

On September 3, 2014, the court entered an order granting in part and denying in part defendant Bell's motion to dismiss. The court granted defendant Bell's motion as to plaintiff's official capacity claim for which plaintiff sought monetary damages. The court denied the remainder of defendant Bell's motion to dismiss. The court subsequently granted extensions of the case management deadlines and expert disclosure deadline, as well as a motion from plaintiff seeking to stay mediation until 45 days after the court rules upon the pending dispositive motions.

On July 1, 2015, defendant Bell filed a motion for summary judgment arguing that plaintiff failed to establish a constitutional violation. Alternatively, defendant Bell raised the affirmative defense of qualified immunity. In support of his motion, defendant Bell submitted portions of plaintiff's deposition transcript, expert reports from Dr. Preston Miller[2] and Dr. Anthony Meyer,[3] and excerpts from the DPS' Policy and Procedure Manual. Plaintiff also filed portions of plaintiff's medical records, which he accompanied with a motion to seal.

Also on July 1, 2015, defendants Catlett, Lewis, Locklear, and Smith filed a motion for summary judgment arguing that plaintiff failed to establish a constitutional violation. Alternatively, defendants asserted the affirmative defense of qualified immunity. In support of their motion, defendants submitted portions of plaintiff's deposition transcript, excerpts from the DPS' Policy and Procedure Manual, and portions of plaintiff's medical records. Defendants each also submitted an

---

[2] Dr. Miller was employed, until June 2009, as an Assistant Professor of Surgery at the Wake Forest University School of Medicine in Winston-Salem, North Carolina. (Miller Report p. 8.)

[3] Dr. Miller is employed as the chair of the Department of Surgery at UNC-Chapel Hill School of Medicine. (Meyer Report p. 2.)

3

affidavit and expert reports from Dr. Anthony Meyer, Nurse Joy Jones,[4] and Dr. Abhay Agarwal.[5] Defendants Catlett, Lewis, Locklear, and Smith then filed a second motion for summary judgment, arguing that plaintiff failed to exhaust his administrative remedies prior to filing this action. Defendants attached to their motion an affidavit from Finesse G. Couch as well as relevant grievances. Plaintiff filed a response to defendants' motion based upon exhaustion, to which plaintiff attached a DPS press release, dated February 17, 2009, indicating that defendant Lewis would become the Director of the DPS on March 1, 2009. Plaintiff also responded to the remaining Defendants' respective motions for summary judgment and attached an affidavit from plaintiff. Defendants filed replies.

## STATEMENT OF FACTS

Except as otherwise noted below, the undisputed facts are as follows. On August 17, 2006, plaintiff, a state inmate, entered DPS custody and was incarcerated at Central Prison. (Pl.'s Aff. ¶¶ 3, 7.) Plaintiff advised Central Prison medical staff that he previously was twice diagnosed as having small bilateral adrenal masses, small adenomas, a left renal cyst, and cholecystitis. (Id. ¶ 4.) Plaintiff further informed staff that physicians had instructed him that his condition required surgery and that he would continue to experience pain without surgery. (Id.)

On November 30, 2006, plaintiff submitted a sick call request at Central Prison complaining that his hernia had not improved. (Id. ¶ 6.) A nurse examined plaintiff on December 1, 2006, and a medical provider prescribed plaintiff Percogesic and an athletic support to be used for six months.[6]

---

[4] Nurse Jones is employed by DPS as a Regional Nurse Supervisor and "Float Nurse." (Joy Report p. 2.)

[5] Dr. Agarwal is employed as the Deputy Medical Director, Director of Utilization Review for North Carolina Department of Public Safety. (Agarwal Report p. 2.)

[6] Plaintiff states that he did not receive the athletic support until October of 2011. (Id. ¶ 6.)

4

(Id.)  Medical staff at Central Prison then treated plaintiff in the Central Prison emergency room for severe abdominal pain and nausea on December 20 and 23, 2006.  (Id. ¶¶ 7, 8, 9.)  After collapsing in his cell on December 24, Central Prison medical staff transferred plaintiff to the Emergency Department at WakeMed, and a physician surgically removed plaintiff's gallbladder.  (Id. ¶ 9.)

The day after his surgery at WakeMed, plaintiff experienced complications related to his gallbladder surgery, and medical staff at WakeMed transferred plaintiff to the University of North Carolina ("UNC") Hospital where Dr. John Martinie performed a hepaticojejunostomy.  (Id.) Plaintiff returned to Central Prison on January 8, 2007.  (Id.)

On February 14, 2007, plaintiff was transferred from Central Prison to Pasquotank Correctional Institution ("Pasquotank").  (Id. ¶ 10.)  On February 25, 2007, plaintiff declared a medical emergency complaining of pain and cramping just below his sternum.  (Id.)  Pasquotank medical staff transferred plaintiff to Albemarle Hospital for further evaluation.  (Id.)  On March 5, 2007, plaintiff was transferred from Pasquotank to Maury Correctional Institution where he was prescribed medication and a wheelchair for his continued complaints of abdominal pain, nausea, and vomiting.  (Id. ¶ 11.)

On June 15, 2007, plaintiff had surgery at UNC Hospital to repair a bowel obstruction and intussusception.  (Id. ¶ 12.)  Four days later, plaintiff was transferred to Central Prison Hospital, and then moved to Central Prison housing unit two.  (Id.)  At some point, plaintiff was transferred from Central Prison back to Maury.  (Id.)  As plaintiff was loading his personal property onto the transfer bus at Central Prison, he felt something "tear loose inside, causing a knot the size of a golf ball to appear at [his] navel."  (Id.)  Due to his transfer from Central Prison, plaintiff missed his post-operative examination with Dr. Martinie, but was able to attend a routine follow-up consultation

5

with UNC General Surgery on August 23, 2007. (Id. ¶¶ 12, 13.) Plaintiff continued to experience problems with abdominal cramping, burning discomfort, and hernias. (Id. ¶ 13.)

On January 26, 2009, plaintiff submitted a sick call request at Maury stating that a nurse informed him on January 9, 2009, that he would be scheduled for an appointment with the facility doctor. (Id. ¶ 14.) Medical staff examined plaintiff two days later, and referred plaintiff to Dr. Owens. (Id.) Plaintiff submitted another sick call request on February 12, 2009, stating that he "had not seen anything posted for [him] to see the PA after being told that [he] would be seen." (Id. ¶ 15.) Plaintiff further stated that he continued to have "constant abdominal pains and cramping" since his December 2006 surgery and that he needed his medications re-filled. (Id.) A nurse responded to plaintiff's sick call request, and informed him that he would be referred to see the medical provider for further evaluation and medication renewal. (Id.)

On February 26, 2009, plaintiff submitted a sick call request complaining that the medication Bentyl, which had been prescribed to ease his abdominal cramps and muscle pain, was not working and that it had not worked when it was tried in 2008. (Id. ¶ 16.) A nurse responded to plaintiff that the provider had increased his Bentyl dosage, and that plaintiff needed to give it time to work. (Id.)

On March 6, 2009, plaintiff was transferred from Maury to Johnston Correctional Institution ("Johnston"). (Id. ¶ 17.) After arriving at Johnston, plaintiff submitted a sick call request stating that he had been undergoing treatment for abdominal pain and cramping at Maury, and that his current medication, Bentyl, was not effective. (Id.) Plaintiff further stated that he had been experiencing his medical issues for approximately two years. (Id.) A nurse examined plaintiff on March 23, 2009, and suggested that plaintiff take antacids. (Id.) Plaintiff refused the antacids "because [he] had [the] problem for two years." (Id.)

On April 14, 2009, the DPS staff transferred plaintiff from Johnston to Lumberton Correctional Institution ("Lumberton"). Shortly after arriving at Lumberton, plaintiff submitted a sick call request complaining about his abdominal problems and that his current medication, Bentyl, was ineffective. (Id. ¶ 18.) Plaintiff further complained that "the cramping and burning muscle pains were so severe in the mornings that [he] could hardly move, much less stand in the medication line, and that this was [not] a new problem and that nothing had helped." (Id.) In response to his sick call request, a nurse provided plaintiff with Ibuprofen for approximately five days and referred plaintiff to a physician. (Id.)

On April 29, 2009, defendant Bell made a provider note in plaintiff's medical records stating that plaintiff had a two-year history of abdominal pain related to cramping and an umbilical hernia. (Def't Bell's Ex. A, p. 35.) Defendant Bell also noted that the medication Bentyl was not effective, and increased the dosage of plaintiff's Bentyl prescription. (Id.) Although this fact is disputed by defendant Smith, plaintiff states that he later wrote defendant Smith a letter explaining his situation and requesting assistance on June 9, 2009. (Am. Compl. ¶ 228.) There is no copy of the letter in the record.

On September 9, 2009, plaintiff submitted a sick call request stating the following:

> The medication (Bentyl) that I was prescribed at Maury [] is and always has been ineffective. Upon my arrival he[re] at [Lumberton] I informed the medical staff of this problem. While I was at Maury the medical dep[artment] was trying to manage the abdominal pains and cramping I have been experiencing since the very first surgery the D.O.C. sent me out for, through "follow-up" sick calls and various medications. Since I've been here, nothing has been done- even after I made it known the problems still exist.

(Def't Bell's Ex. A, pp. 37-38.) On September 16, 2009, defendant Bell ordered a series of laboratory tests, including CBC and CMP, lipids, and TSH testing. (Id. p. 34.) Then, on September

7

30, 2009, defendant Bell ordered an electromagnetic radiation test ("x-ray") of plaintiff's abdomen. (Id. p. 2.) Defendant Bell prescribed plaintiff Bentyl, Depakote, and Valproic Acid on October 28, 2009, and then prescribed Prilosec on November 2, 2009. (Id. p. 34.)

On December 6, 2009, plaintiff experienced a fall at Lumberton due to painful muscle spasms, cramps, and his hernias. (Pl.'s Aff. ¶ 23.) Plaintiff saw a medical provider 10 days later. (Id. ¶ 24; Def.'t Bell's Ex. A, p. 35.) Then, on December 21, 2009, defendant Bell submitted a request to the Utilization Review Board ("URB") for a general surgical consultation for plaintiff's abdominal pain. (Def't Bell's Ex. A, p. 3.) In requesting this consultation, defendant Bell indicated to the URB that plaintiff had several painful incisional hernias and was suffering from pain and cramps. (Id. p. 71.) Defendant Bell further indicated that, if left untreated, plaintiff's condition would continue to deteriorate significantly prior to plaintiff's release from prison. (Id. p. 3.) Defendant Bell's request for a surgical consultation was "pended"[7] by Dr. Phillip E. Stover, a member of the URB, on January 27, 2010, and eventually denied by Dr. Stover on February 10, 2010. (Id. p. 4.) In denying the URB request, Dr. Stover instructed defendant Bell to "attempt conservative management of [Plaintiff's] symptoms." (Id.)

On March 9, 2010, defendant Bell submitted a second URB request, on behalf of plaintiff, for a general surgical consultation. (Id.) The second URB request was pended on two occasions, but the URB ultimately approved the request on May 12, 2010. (Id. p. 5.) On May 19, 2010, plaintiff attended a surgical consultation appointment at Central Prison, and the surgeon recommended that plaintiff follow-up with the general surgery unit at UNC Hospital. (Id. p. 8; Pl.'s Aff. ¶ 29.) On July 13, 2010, defendant Bell submitted an urgent request to the URB for a follow-up

---

[7] If the URB requires additional information, the URB request is returned to the requesting provider as "pended." (Am. Compl. ¶ 82.)

consultation with UNC General Surgery. (Def't Bell Ex. A, p. 7.) The URB approved the request on July 15, 2010. (Id. p. 8.)

On August 10, 2010, plaintiff attended a surgical consultation with Dr. Bunzendhal Hartwig at UNC General Surgery, and Dr. Hartwig noted: "The workup for [plaintiff's gastrointestinal ("GI")] issues appears to be incomplete considering his ongoing complaints. Hernia repair prior to resolution of GI issues is unwise since the hernia repairs will require mesh implants." (Id. pp. 76-77.) Dr. Hartwig further recommended that plaintiff be referred to Dr. Martinie, the physician who previously repaired damage done to plaintiff's bile duct, due to plaintiff's excellent relationship with Dr. Martinie. (Id.) At the relevant time, Dr. Martinie was practicing at Carolina Medical Center in Charlotte, North Carolina. (Id.)

On October 5, 2010, defendant Bell submitted a request to the URB for a general surgical consultation with Dr. Martinie. (Id. p. 8.) The URB initially denied defendant Bell's request on November 3, 2010, but ultimately approved the request on November 16, 2010. (Id. p. 9.) Plaintiff saw Dr. Martinie on December 7, 2010, and reported symptoms of abdominal pain, diarrhea, and weight loss (approximately 10 pounds over a two to three month period). (Id. p. 99.) After examining plaintiff, Dr. Martinie recommended a GI consultation, a colonoscopy, and a computerized tomography examination of plaintiff's abdomen and pelvis prior to performing abdominal surgery. (Id. p. 101.) Dr. Martinie further recommended that plaintiff be scheduled for a right umbilical hernia repair and inguinal hernia repair in the first part of January 2011. (Id.)

On December 13, 2010, defendant Bell submitted a URB request for plaintiff to have a GI consultation and colonoscopy. (Id. pp. 10.) The URB approved the request, and plaintiff had a colonoscopy on February 2, 2011. (Id. pp. 11, 55.) On that same date, defendant Bell submitted a

9

"rush" URB request seeking approval for surgical repair of plaintiff's right inguinal hernia, umbilical hernia, and incisional hernia, which was approved on February 8, 2011. (Id. p. 13.) On February 24, 2011, Bell submitted a "rush" URB request seeking approval for a general surgical consultation, which was approved on March 1, 2011. (Id. p. 14.) Plaintiff's surgery then was scheduled for March 14, 2011. (Id.)

In the interim, on February 22, 2011, plaintiff attended an appointment with a gastroenterologist for investigation into his weight loss, abdominal pain, and diarrhea. (Pl.'s Aff. ¶ 45.) Following his appointment, defendant Bell submitted a "rush" URB request, on February 28, 2011, for a bowel biopsy for plaintiff. (Def't Bell's Ex. A, p. 15.) On that same date, defendant Bell also submitted a "rush" URB request for another GI consultation at the recommendation of plaintiff's outside medical providers. (Id.) Both requests were approved on March 2, 2011. (Id. pp. 15, 16.) The notes associated with the approval of the requests state that plaintiff was being "worked-up" in the University of North Carolina Gastroenterology ("UNC GI") Clinic for weight loss, abdominal pain, and diarrhea. (Id. p. 16.) The UNC GI clinic also indicated that they wanted to follow-up with plaintiff in two months as they considered "hyperactive gastric-colic reflex, celiac spruce, malabsorption vs. colitis." (Id. pp. 16-17.) Finally, the UNC GI clinic recommended that plaintiff's hernia repair surgery be postponed until after their GI evaluation was complete. (Id. p. 17.)

On March 22, 2011, plaintiff attended a follow-up appointment with the UNC GI clinic, at which time medical staff recommended that plaintiff receive a CT scan of his abdomen and pelvis as well as another follow-up appointment in four weeks to further evaluate plaintiff's symptoms. (Id. pp. 19, 64.) Defendant Bell submitted a request for the CT scan on May 16, 2011, the URB

approved the request on June 21, 2011, and the CT scan was performed on June 28, 2011. (<u>Id.</u> p. 19.) The results of the CT scan revealed "an umbilical hernia and a smaller ventral midline abdominal wall defect above the umbilical hernia." (<u>Id.</u> p. 82.) The URB approved another UNC GI clinic consultation on June 21, 2011. (<u>Id.</u> p. 20.)

Plaintiff attended an appointment in the UNC GI clinic on July 12, 2011. (<u>Id.</u> p. 22.) The treating physician recommended that plaintiff attend a follow-up appointment six months later. (<u>Id.</u>) Plaintiff was transferred from Lumberton to Harnett Correctional Institution ("Harnett") on July 14, 2011. (Pl.'s Aff. ¶ 56.) In addition to the above-stated care that plaintiff received while at Lumberton, defendant Bell prescribed several medications including Valproic Acid, Omeprazole, Baclofen, Naprosyn, Prilosec, Prozac, Fluoxetine, Depakote, Metamucil, psyllium packets, Hyoscyamine, and Promethazine suppositories from November 2, 2009, until his transfer to Harnett. (Def't Bell's Ex. A, pp. 106-156.)

On July 28, 2011, a physician at Harnett recommended that plaintiff be transferred to a DPS facility closer to Charlotte in preparation for his surgery, and plaintiff was transferred to Avery-Mitchell Correctional Institution ("Avery-Mitchell") on August 23, 2011. (<u>Id.</u> ¶¶ 59, 61.) Plaintiff attended his pre-operative examination with Dr. Martinie at Carolinas Medical Center in October 2011. (Pl.'s Aff. ¶ 63.) On October 27, 2011, plaintiff was transferred from Avery-Mitchell to Pender Correctional Institution ("Pender"). (<u>Id.</u> ¶ 64.)

On October 30, 2011, plaintiff submitted a sick call request at Pender complaining that he was unable to walk the distance to the dining hall or to stand in the medication line. (<u>Id.</u> ¶ 65.) Plaintiff also stated in his sick call request that he had not been able to eat since his arrival at Pender and that transferring facilities three times since July 14, 2011, had caused more abdominal pain from

lifting his personal property and walking.  (Id.)  A nurse subsequently examined plaintiff.  (Id.)  When plaintiff asked the nurse when his surgery was scheduled, the nurse said that there "was nothing in [his] records about a surgery."  (Id.)  A physician at Pender then informed plaintiff on January 19, 2012, that plaintiff did not have a pending surgery.  (Id. ¶ 68.)  On the same date, the URB approved plaintiff for a pre-operative consultation after his surgeon reported that there had been enough consultations to move forward with plaintiff's surgery and expressed a desire to perform the procedure as soon as possible.  (Def't Bell's Ex. A, p. 22-23.)  Plaintiff was transferred to from Pender to Piedmont Correctional Institution on January 31, 2012.  (Pl.'s Aff. ¶ 70.)

On February 14, 2012, plaintiff had hernia repair surgery.[8]  (Id. ¶ 71.)  Plaintiff attended a post-surgical follow-up appointment on March 22, 2012.  (Id.)  Plaintiff then was transferred back to Pender, where plaintiff remains incarcerated.  (Id. ¶ 72.)  Following his surgery, plaintiff experienced significant improvement with no pain episodes for several months.  (Id. ¶ 73.)  Plaintiff's symptoms, however, have now begun to return, and plaintiff states that the DPS has been unwilling to permit him access to a specialist or medication to improve his symptoms.  (Id. ¶ 74.)

---

[8]  Plaintiff states in his amended complaint that he was suffering from multiple incarcerated hernias, which constituted a medical emergency pursuant to the Utilization Management policy. (Am. Compl. ¶¶ 234, 237.)  Plaintiff, however, does not allege that he suffered from incarcerated hernias in his affidavit.  Further, defendants medical expert Dr. Miller reports that he did not find a diagnosis of incarcerated hernias in plaintiff's medical records.  See (Miller Report p. 3.)

**DISCUSSION**

A.      Motion to Seal

Defendant Bell moves this court to issue an order sealing "Exhibit A" attached to his motion for summary judgment because it contains excerpts from plaintiff's medical records.  Local Rule 26.1(a)(1) of this court's Local Rules of Practice and Procedure requires that medical records not be open to inspection or copying by any person except the parties and their attorneys.  It further requires the filing of any such records to be accompanied by a motion to seal.  Based upon the foregoing, defendant Bell's motion to seal is GRANTED, and "Exhibit A" hereby is sealed.  <u>See, e.g.</u>, <u>Roberson v. Paul Smith, Inc.</u>, No.  5:07-CV-284-F, 5:08-CV-40-F, 2010 WL 2332282, at * 1 (E.D.N.C. June 9, 2010).

B.      Motion for Summary Judgment

1.      Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 247 (1986).  The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial.  <u>Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  <u>Anderson</u>, 477 U.S. at 250.

2.      Analysis

        a.      Failure to Exhaust Administrative remedies

Defendants Catlett, Lewis, Locklear, and Smith raise the affirmative defense of failure to exhaust administrative remedies.  Title 42 U.S.C. § 1997e(a) of the Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust his administrative remedies before filing an action under 42 U.S.C. § 1983 concerning his confinement.  Woodford v. Ngo, 548 U.S. 81, 83-85 (2006); see Jones v. Bock, 549 U.S. 199, 217 (2007) ("failure to exhaust is an affirmative defense under [42 U.S.C. § 1997e]"); Anderson v. XYZ Corr. Health Servs., Inc., 407 F.3d 674, 683 (4th Cir. 2005). The PLRA states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner . . . until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); see Woodford, 548 U.S. at 84.  Exhaustion is mandatory.  Woodford, 548 U.S. at 85; Porter v. Nussle, 534 U.S. 516, 524 (2002) ("Once  within the discretion of the district court, exhaustion in cases covered by § 1997e(a) is now mandatory."); Anderson, 407 F.3d at 677.  A prisoner must exhaust his administrative remedies even if the relief requested is not available under the administrative process.  Booth v. Churner, 532 U.S. 731, 741 (2001).  "[U]nexhausted claims cannot be brought in court."  Jones, 549 U.S. at 211.

Defendants concede that plaintiff exhausted his administrative remedies for several grievances related to his medical care prior to filing the instant action.  In response, plaintiff asserts that five of the exhausted grievances relate to the instant action.  Particularly, plaintiff contends that his December 10, 2010, grievance satisfies the PLRA's exhaustion requirement as to each of the remaining defendants in the action.  Plaintiff's December 10, 2010, grievance provides in pertinent part:

14

On 15 Dec. 2010, I was called to medical in regards to a scheduled Dr./P.A. appointment. Since Oct. 2010 I've submitted numerous "sick call" requests pertaining to my medications– these "sick-calls" were ignored. The P.A. appointment I had today came only through the effort of Dr. Atwater (Psych Ser.) in Raleigh. Dr. Atwater ordered an evaluation of my medicine I take for migraines.

Dr. Ron Bell is, and has been, "deliberately indifferent" to my health and well being the entire time I've been incarcerated at Lumberton Correctional. Every time I'm scheduled for Dr./P.A. appointment I'm scheduled for Dr. Bell, and every appointment is confidential. Dr. Bell does not listen to anything I say. He has called me a liar. He has said that I have NO medical problems. Dr. Bell does not care and he is deliberately impending my medical treatment and care. I have major medical issues– my medical file speaks for itself, as well as opinions and diagnosis from "outside doctors." (Outside the D.O.C.)

The only time anything moves forward (i.e., my recent medical appointment with Dr. John Martinie in Charlotte) is by circumventing Dr. Bell or when an "outside doctor" recommends such to the UR Board in Raleigh.

My health has, and is continuing to decline due to Dr. Bell's callousness, carelessness, and deliberate indifference to my medical issues. The one time Dr. Bell sent me anywhere, and this was to Central Prison to see a doctor about my hernias, he sent me to see the very doctor who caused my injuries! Dr. Bell completely disregards the underlying medical issues I have and simply wants to rush the hernia operation through Dr. Lutz at Central Prison. (Dr. Lutz is a surgeon at WakeMed)[.]

(Couch Aff. Ex. E pp. 2, 4.)

Defendants Lewis, Catlett, Locklear, and Smith, however, argue that plaintiff's December 10, 2010, grievance is insufficient to exhaust plaintiff's administrative remedies as to his claim against them because such grievance did not put them on notice of plaintiff's complaints. The PLRA does not require particularity with respect to grievances. Rather, one of the main purposes of a prison grievance system is to allow administrators a fair opportunity to address the problem that will later form the basis of suit. Jones, 549 U.S. at 219; Johnson v. Johnson, 385 F.3d 503, 522 (5th

15

Cir. 2004); <u>Moore</u>, 517 F.3d at 729. To accomplish this goal, an inmate is required to allege conduct that will later be challenged in the civil lawsuit. <u>See Moore</u>, 517 F.3d at 729; <u>see also</u>, <u>Sturkey v. Stirling</u>, No. 2:13-cv-3451, 2014 WL 6460285, at *4-5 (D.S.C. Nov. 17, 2014) (finding a grievance exhausted as to plaintiff's claims against the Regional Director and Director of the South Carolina prison system, despite plaintiff's failure to name such defendants in the grievance a grievance does not need to name particular defendants to be exhausted), <u>aff'd</u>, 599 F. App'x 533 (4th Cir. 2015). The court finds that the allegations plaintiff's December 10, 2010, grievance provide each of the defendants in this action with adequate notice of plaintiff's claims. Thus, the motion for summary judgment arguing failure to exhaust administrative remedies is DENIED.

    b.  Eighth Amendment Claims

   Defendants raise the defense of qualified immunity in response to plaintiff's allegations that they acted with deliberate indifference to plaintiff's serious medical needs in violation of the Eighth Amendment. Government officials are entitled to qualified immunity from civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). In other words, a government official is entitled to qualified immunity when (1) the plaintiff has not demonstrated a violation of a constitutional right, or (2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct. <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009). The court next considers whether plaintiff has established a constitutional violation.

1. Bell and Locklear

An Eighth Amendment claim based upon deliberate indifference to serious medical needs requires two showings, one objective and one subjective. First, an inmate must prove that "the deprivation of a basic human need was objectively sufficiently serious." De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003) (internal quotations omitted). Second, the inmate must prove that "subjectively the officials acted with a sufficiently culpable state of mind." Id. (internal quotations omitted).

Defendants Bell and Locklear do not dispute that plaintiff suffered serious injuries. Accordingly, the court's analysis focuses on the subjective prong of the Eighth Amendment test–whether Bell or Locklear acted with deliberate indifference. Deliberate indifference "sets a particularly high bar to recovery." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). "In order to establish a claim of deliberate indifference to a medical need, the need must be both apparent and serious, and the denial must be both deliberate and without legitimate penological objective." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999). "[D]eliberate indifference entails something more than negligence, . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." See Farmer v. Brennan, 511 U.S. 825, 835 (1994). It requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm. Id. at 837; Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995). An inmate is not entitled to choose his course of treatment. See Russell v. Sheffer, 528 F.2d 318, 318-19 (4th Cir. 1975) (per curiam). Likewise, mere negligence or malpractice in diagnosis or treatment does not state a constitutional claim. Estelle v. Gamble, 429 U.S. 97, 105-106 (1976); Johnson v. Quinones, 145 F.3d 164, 168 (4th Cir. 1998).

17

The court begins its analysis with plaintiff's Eighth Amendment claim against defendant Bell. Plaintiff asserts that Bell acted with deliberate indifference to the fact that the prescribed medications were ineffective in managing plaintiff's pain, intentionally delayed requesting necessary specialty consultations from the URB, failed to provide the URB with necessary information to gain approval for plaintiff's treatment, refused to respond to pended or denied URB requests, repeatedly ignored treatment recommendations made by specialists without medical justification, and failed to adequately review the treatment provided by medical staff at Lumberton.

As for plaintiff's claim related to the provision of pain medication, the record reflects that defendant Bell prescribed several medications to treat plaintiff's pain and gastrointestinal issues while plaintiff was incarcerated at Lumberton, including: Valproic Acid; Omeprazole; Baclofen; Naprosyn; Prilosec; Prozac; Fluoxetine; Depakote; Metamucil; psyllium packets; Hyoscyamine; and Promethazine suppositories. ((Def't Bell's Ex. A, pp. 106-156.) The record further reflects that when plaintiff arrived at Lumberton, his abdominal pain was a chronic condition. (Miller Report p. 2.) Specifically, defendant Bell's expert, Dr. Miller, opined that a person suffering from "a chronic condition . . . may continue to have symptoms even with the provision of medication and surgical interventions, as was evident in this case as [plaintiff's] symptoms did not appear to improve significantly after surgical intervention and despite rendition of multiple medications and different treatments." (Id.) Although plaintiff asserts that defendant Bell's efforts in treating his pain with these medications was not effective, the fact that Bell's treatment of plaintiff was not effective does not give rise to a constitutional violation. See, Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014) ("Though hindsight suggests that Lightsey's treatment decisions may have been mistaken, even gravely so, we agree with the district court that Jackson's claim against Lightsey is

essentially a [d]isagreement[ ] between an inmate and a physician over the inmate's proper medical care, and we consistently have found such disagreements to fall short of showing deliberate indifference.") (internal quotations and citations omitted); <u>Russell</u>, 528 F.2d at 319; <u>see also</u>, <u>Johnson</u>, 145 F.3d at 167 (finding that negligent acts are not sufficient to establish a constitutional violation); <u>Yagman v. Johns</u>, No. 5:08-HC-3089-FL, 2010 WL 7765708, at *5-6 (E.D.N.C. Mar. 29, 2010) (finding that plaintiff's disagreement with prescribed medications used to treat his blood pressure did not establish an Eighth Amendment claim); <u>Starling v. United States</u>, 664 F. Supp. 2d 558, 569-70 (D.S.C. 2009) ("Moreover, as noted in *Russell*, the mere fact that a prisoner may believe that he required a different form of treatment does not establish a constitutional violation.").

As for plaintiff's contention that defendant Bell intentionally delayed his hernia surgery or ignored treatment recommendations made by specialists for no medical reason, this claim too lacks merit. The Fourth Circuit Court of Appeals has held "that a delay with respect to hernia surgery does not necessarily constitute deliberate indifference, absent some resultant harm or a worsened condition." <u>Webb v. Hamidullah</u>, 281 F. App'x 159, 167 (4th Cir. 2008); <u>see, e.g.</u>, <u>Jackson v. Metiko</u>, No. 5:06-CT-59-FL, 2008 WL 4279694, at *9 (E.D.N.C. Sept. 15, 2008) (finding that nearly six month delay in treating ventral hernia did not amount to deliberate indifference where the defendant saw plaintiff on a regular basis and conducted various diagnostic tests). Defendant Bell's expert, Dr. Meyer, opines in his report that nothing in the surgical notes from plaintiff's February 2012 hernia surgery indicates "damage to the tissues from the hernias." (Meyer Report p. 3.) Dr. Meyer further opined that plaintiff's hernias were not medical emergencies which required emergency care. (Meyer Report p. 3.)

19

More importantly, there is no evidence in the record suggesting that defendant Bell intentionally delayed the provision of any medical care in connection with making URB requests for specialty consultations, providing information to the URB, responding to pended or denied URB requests, responding to specialists' recommendations, or reviewing treatment provided by Lumberton medical staff. Rather, the record reflects that defendant Bell examined plaintiff and referred him for a surgical consultation shortly after plaintiff's arrival at Lumberton. (See Def.'t Bell Ex. A, p. 3). Defendant Bell was responsive to the recommendations made by plaintiff's outside medical providers. (See id. pp. 2-14). To the extent there was any delay in plaintiff's hernia surgery while plaintiff was at Lumberton under the care of Bell, it was a result of the URB's decision to deny Bell's initial request for a surgery consultation with the direction from Dr. Stover to attempt conservative management of plaintiff's symptoms, and the outside medical providers' decisions to further investigate plaintiff's medical condition. (Def't Bell's Ex. A, pp. 4, 99). In fact, plaintiff, himself, admits in his deposition that he is not aware of any specific facts which suggest that Bell engaged in conduct that made the URB delay his treatment. (Def.'t Bell's Ex. B., p. 10).

Based upon the foregoing, plaintiff failed to establish that defendant Bell acted with deliberate indifference to his medical condition. See Estelle, 429 U.S. at 104-05 (holding that deliberate indifference may be demonstrated by "intentionally denying or delaying access to medical care"); Farmer, 511 U.S. at 833-34 (finding that deliberate indifference requires that a prison officials knows of and disregards a substantial risk to an inmate's health); see, e.g., Ward v. Deboo, No. 1:11cv68, 2012 WL 2359440, at *13 (N.D.W.Va. Jan. 18, 2012), aff'd, 482 F. App'x 852 (4th Cir. Oct. 16, 2012) ("The medical records submitted by the defendant demonstrate that the plaintiff was provided regular, continuous and appropriate medical care under the circumstances, and that

there has never been an intentional interference with a prescribed course of treatment. Accordingly, nothing the record shows that the plaintiff's knee condition was not timely or properly treated."). At most, defendant Bell's actions constituted negligence, which is insufficient to establish a constitutional violation. Grayson, 195 F.3d at 695 ("Deliberate indifference is a very high standard-a showing of mere negligence will not meet it."). Based upon the foregoing, the court finds plaintiff failed to establish a constitutional violation, and Bell is entitled to qualified immunity. Because the court found no constitutional violation as to plaintiff's claim against defendants Bell, plaintiff's supervisor liability claim against Bell also fails.

The court now turns to plaintiff's Eighth Amendment claim against defendant Locklear.[9] Plaintiff asserts that Locklear ignored his complaints, continued to provide treatment which plaintiff repeatedly complained was ineffective, and failed to submit appropriate information to the URB. The record, however, reflects that plaintiff was seen and timely evaluated for each sick call request he submitted while at Lumberton. (Locklear Aff. Ex. B.) There is no indication in the record that defendant Locklear failed to submit appropriate information to the URB, nor is there any indication that defendant Locklear was dismissive of plaintiff's complaints. Rather, plaintiff, himself, testified in his deposition that defendant Locklear discussed plaintiff's symptoms with him and answered his questions. (Locklear Aff. Ex. B and Def.t's' Ex. B, p. 8.)

As for plaintiff's disagreement with the treatment defendant Locklear provided, the record reflects that it was the responsibility of the physicians at Lumberton, and not defendant Locklear, to diagnose inmates or to prescribe a course of treatment. (Locklear Aff. ¶ 5.) Further, defendant Locklear's expert, Joy Jones, opines in her report that defendant Locklear "appropriately responded

---

[9] Defendant Locklear's involvement with plaintiff was limited to the dates plaintiff was incarcerated at Lumberton.

to and evaluated Plaintiff timely." (Joy Report p. 3.)  As a result, plaintiff, at most, has established

a disagreement between an inmate and a medical care provider regarding the appropriate form of

treatment, which does not establish a claim for deliberate indifference. See Wright v. Collins, 766

F.2d 841, 849 (4th Cir. 1985). Likewise, as stated, any negligence or malpractice in diagnosis or

treatment does not state a constitutional claim. Estelle, 429 U.S. at 105–106; Johnson, 145 F.3d at

168.  Accordingly, plaintiff failed to satisfy the objective prong of the Eighth Amendment test, and

Locklear is entitled to qualified immunity.

### 2.    Catlett, Lewis, and Smith

Plaintiff's claims against defendants Catlett, Lewis, and Smith are based upon their

capacities as the DPS supervisors.  Supervisors in a § 1983 action may not be held liable based upon

a theory of *respondeat superior*.  Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009); Monell v. Dep't of

Social Services, 436 U.S. 658, 694 (1978).  Instead, "liability ultimately is determined 'by

pinpointing the persons in the decision making chain whose deliberate indifference permitted the

constitutional abuses to continue unchecked.' "  Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994)

(quoting Slakan v. Porter, 737 F.2d 368, 372-73 (4th Cir. 1984)).  To establish supervisor liability

under § 1983, a plaintiff must establish:

> (1)    that the supervisor had actual or constructive knowledge that
> his subordinate was engaged in conduct that posed "a
> pervasive and unreasonable risk" of constitutional injury to
> citizens like the plaintiff;
>
> (2)    that the supervisor's response to that knowledge was so
> inadequate as to show "deliberate indifference to or tacit
> authorization of the alleged offensive practices"; and
>
> (3)    that there was an "affirmative causal link" between the
> supervisor's inaction and the particular constitutional injury
> suffered by the plaintiff.

22

Shaw, 13 F.3d at 799.

Beginning with plaintiff's claim against defendant Lewis, Lewis was employed as the Director of Prisons for the DPS during the relevant time period. (Lewis Aff. ¶ 3.) Lewis did not supervise the provision of health care to inmates. As was done in this action, Lewis was entitled to rely on the medical judgments and expertise of prison physicians and medical personnel concerning the course of treatment deemed necessary for prisoners. See Shakka, 71 F.3d at 167 (citation omitted); Meloy v. Bachmeier, 302 F.3d 845, 849 (8th Cir. 2002) ("Prison officials cannot substitute their judgment for a medical professional's prescription."). Additionally, there is no evidence that Lewis had actual or constructive knowledge that any subordinate was engaged in conduct that posed a pervasive and unreasonable risk of injury. Nor has plaintiff shown any causal link between any alleged action taken by defendant Lewis and plaintiff's alleged injury. See Slakan, 737 F.2d at 372–73. Thus, plaintiff failed to establish a constitutional violation, and defendant Lewis is entitled to qualified immunity.

The court now addresses plaintiff's supervisor liability claim against defendant Catlett, the Deputy Director of Health Services for the DPS. (Catlett Aff. ¶ 3.) Plaintiff seeks to hold Catlett liable for the alleged deliberate indifference of the URB based upon plaintiff's contention that Catlett reviewed all pended URB requests and, in fact, directly reviewed plaintiff's URB requests and acted with deliberate indifference to plaintiff's serious medical needs. (Am. Compl. ¶¶ 32, 34.)

Catlett submitted an affidavit, in support of his motion for summary judgment, attesting that he performs a purely administrative role in his position with DPS and does not provide hands-on clinical patient care to patients or have control over the day-to-day clinical decisions of the defendant physicians or healthcare providers. (Catlett Aff. ¶ 4.) Catlett further attests that he did

not provide any care or treatment, supervisory or otherwise, to plaintiff and that he was not involved in any of the determinations made by the URB. (Id. ¶ 6.) Catlett's statements are supported by the URB documents in the record. See (Def't Bell's Ex. A, pp. 2-33.) Although the DPS' Health Services Policy and Procedure Manual reflects that defendant Catlett, as DPS' Deputy Medical Director, was responsible for overseeing appeals from URB denials, there is no evidence in the record to suggest that any medical provider made a URB appeal on behalf of plaintiff or that Catlett was involved with any appeals pertinent to this action. Moreover, plaintiff has not submitted any evidence to support a finding that Catlett had any involvement with any URB decisions involving plaintiff's medical care whatsoever. Thus, plaintiff failed to establish any of the three requirements necessary to establish a supervisor liability claim against Catlett, and Catlett is entitled to qualified immunity.

Finally, the court turns to plaintiff's supervisor liability claim against defendant Smith. Plaintiff alleges that Smith, as the Chief of Health Services for the DPS, was responsible for the establishment and maintenance of the URB and that she is aware that the URB fails to meet the medical needs of inmates. Plaintiff, however, points to no evidence to suggest that there is any fundamental deficiency with the URB or that Smith is aware of any such deficiency.

As for Smith's involvement with plaintiff's medical care, Smith submitted an affidavit attesting that she does not provide hands-on clinical patient care to inmates and does not have control over the day-to-day clinical decisions of the DPS physicians or healthcare providers. (Smith Aff. ¶ 4.) Smith further attests that she did not provide plaintiff medical care, make utilization review decisions for plaintiff, or specifically direct that any specific care be provided or refused to

plaintiff pursuant to the utilization review process. (Id. ¶ 5.) Plaintiff provided no evidence to contradict Smith's affidavit.

Plaintiff, additionally, hinges his supervisor liability claim against Smith upon his contention that he wrote Smith a letter complaining about his medical condition on June 9, 2009, but that Smith took no action. Plaintiff has not provided any evidence to establish that he did, in fact, send the letter to Smith. Further, even if plaintiff did send the alleged June 9, 2009, letter, this fact still would not support a claim against defendant Smith because the letter was sent during the time period when plaintiff was cared for by defendant Bell, and this court has determined that Bell did not act with deliberate indifference to plaintiff's serious medical needs. Based upon the foregoing, the court finds that there is no evidence to support any of the three factors necessary to support a supervisor liability claim. See Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 256 (stating that a plaintiff must offer "significant probative evidence tending to support the complaint."). Thus, defendant Smith is entitled to qualified immunity for this claim.

To the extent plaintiff seeks to hold the supervisory defendants responsible, in their official capacities, for any particular DPS policy or to hold any defendant liable for any post-operative medical issues, his claims fail. Plaintiff has presented no factual support, aside from conclusory allegations, or any evidence to support any such claims. Thus, defendants are entitled to summary judgment for these claims. See Ashcroft, 556 U.S. at 663, 678–79 (stating that a complaint must state "a plausible claim for relief," and that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice,"); White v. White, 886 F.2d 721, 723 (4th Cir.1989) (stating minimum level of factual support required to state a constitutional claim).

**CONCLUSION**

For the foregoing reasons, the court rules as follows:

(1) Bell's motion to seal (DE 128) is GRANTED;

(2) The second motion for summary judgment filed by defendants Catlett, Lewis, Locklear, and Smith (DE 129) is DENIED;

(3) Defendants' respective remaining motions for summary judgment (DE 115, 117) are GRANTED;

(4) The clerk of court is DIRECTED to close this case.

SO ORDERED, this the 29th day of September, 2015.

LOUISE W. FLANAGAN
United States District Judge